Titus, Ch. J.
—After the evidence for both plaintiff and defendant had all been given, the court, on motion of the defendant, nonsuited the plaintiff and gave judgment against him for costs, on the ground, as stated in the motion, of a failure to make out a case, and that no damages had been proved.
The defendant is a transportation company, and during the summer of 1893 was engaged in carrying passengers to different lake ports and to the World’s Fair at Chicago. In its pamphlets and circulars the defendant advertised to take passengers to Chicago for nineteen dollars, special tourist rates. It is stated that these rates include meals and berths in stateroom, and for further information the would-be tourist is directed to apply to the agent of the company, or to Daniel H. Wilcox, general passenger agent, at Buffalo, H. Y. It is further stated : “ To those intending to visit the World’s Fair the special attractions of this beautiful lake trip to Chicago are presented. We make close connections at the Sault St. Marie, at the head of Lake Huron, with a fine fleet of steamers of the Lake Michigan & Lake Superior Transportation Company. A cool, delightful and healthy trip on the great inland seas. Ho dust. Airy and comfortable staterooms. ” These attractive circulars are made more or less so by a flourish of conspicuous type, which readily catches the eye and attracts the attention of the traveler caring to escape the discomforts of a trip to Chicago in the dust and heat of the summer months.
The plaintiff, a practicing physician, having about the first of August made up his mind to suspend temporarily the practice of his profession and to visit the great World’s Fair at Chicago, went to the numerous ticket offices on Exchange street and procured pamphlets of the different transportation companies, among them the circular and pamphlets issued by the defendant at its office in this city and from which we have quoted. After reading the circular and sufficiently reflecting on the matter, on the sixteenth of August he called at the office of the agent of the defendant, Mr. Wilcox, and found Mr. Doty representing the company, whom he informed that he had “ fully considered the matter of going to *698 Chicago and had concluded to take the defendant’s line in preference to the railroad because he wanted a comfortable trip; he could not sleep on a car, and, bj' taking the defendant’s line, he could get rest and recreation at the same time and arrive in Chicago in good condition.” Mr. Doty, the agent, after the matter had been fully explained to him by the doctor, said he thought the idea was a good one, and the doctor was so well satisfied with the plan of his trip5 that, after considering it another night, he went the following day and told Doty “ he had made up his mind positively to go to Chicago,” and, after some further talk with Doty, in which the doctor was informed that two ladies had engaged the stateroom he wanted, but the accommodating agent would put them in another and less desirable room and assign that room to the doctor, and after the doctor’s chivalric protest that “ he did not like to drive these ladies out of their room,” he concluded to take the room and bought two tickets, for which he paid thirty-eight dollars.
The doctor with his wife presumably had a pleasant trip, as we hear of no complaint from him until the following Tuesday morning, between six and seven o’clock, when the Empire State landed at the “ Soo.”
He says he made inquiry of the purser or captain where the boat which was to take them to Chicago was, and the City of Duluth being pointed out to him, he got aboard of her and went to the ticket office and “ found it closed.” “ There were two ladies that came down from Buffalo on the Empire State going to the World’s Fair." Whether these were the same two ladies whose stateroom the doctor got from the agent in Buffalo does not appear. ’He says he then went back and got his breakfast, and again went to tile ticket office of the City of Duluth, and found the agent arranging for rooms with a gentleman and two ladies, who were told by the agent that it would be impossible to accommodate them with rooms, and from that the plaintiff inferred that he could not get a room. However, he handed his ticket to the agent, who looked at the doctor and smiled, and said : “ I will see. what I can do for you.” Then the doctor walked away, probably in the full belief, induced by that smile of the ticket agent, that he would be satisfactorily provided with a room. After-some time spent in seeing the town, he got on board and started for Chicago. About noon, according to the doctor’s story, he went down to the purser, when the following conversation took place: “Says I, ‘Well, how about a room for me on the boat.’ ‘Well,’ he says, ‘I cannot give you any; you haven’t got any ’ (of which fact the doctor was undoubtedly fully aware), and said: ‘ That’s a nice note,’ says I; ‘ I paid for a first class fare and I believed that I was going to have a stateroom, and I paid for one and I want it.’ ‘Well,’ he says, T cannot give you any; I cannot turn a person Out of a room and put you in.’ Says I, ‘That isn’t my lookout; that is your lookout.’ We talked a little while together, and says I, ‘When I get back to Buffalo I am going to the Western Transit Company and raise hell,’ ” which he on his arrival in Buffalo proceeded to do.
*699 I have quoted thus largely from the plaintiff’s testimony to show his understanding and interpretation of the contract which he had entered into with the defendant and of his persistent intention of enforcing it, even at the risk of serious consequence to all concerned.
About eleven o’clock, when all had become weary of looking at the stars and of hearing the swash of the water against the sides of the sturdy vessel, the doctor descended into the cabin and saw the servants carrying mattresses and passengers selecting cots, when he met the purser “and asked him, says I, ‘Can’t I have one of those mattresses and put in the gangway there ?’ He says (I quote from the testimony) ‘Yes, you can do that if you want your head smashed in.’ Says I, ‘I will look out for my head all right.”’ He says he took the mattress and placed it in the gangway between the main saloon and the deck. He says he preferred this busy, breezy place to lying with the crowd in the saloon. Evidently the doctor’s wife was not of the same opinion, or fascinated with the idea of a night’s rest in the gangway, where she was liable to have her head “smashed in,” for, after about half an hour, she left him, saying she perferred sitting in a chair to lying on the floor. The doctor’s efforts to get rest do not appear to have been very successful, for he tells us he did not get any rest or sleep that night and fared no better the next.
On his return to Buffalo he called on Mr. Doty, with the evident intent of making good his promise to the agent at the “Soo,” and told him how he fared. Mr. Doty was very sorry that such a thing should happen to the doctor, and said he would tell Mr. Wilcox all about it, and as he was going up to the “Soo” he would have a chance to talk it over with the other company and see what he could do for him. With this fair, but somewhat equivocal promise, the plaintiff went away apparently satisfied. But as time sped on and he heard no more from Doty or Wilcox, or the agent at the “Soo,” he again called on Doty and learned that Wilcox had returned, and after going to the office of the company on Main Street and on the Beed dock several times in search of Wilcox, and not finding him, at last located the missing agent at the office of the company on Main street, and after a long argument by the doctor that something should be done and the frequently repeated replies of Wilcox that nothing could be done for him, the plaintiff then called on the general manager, Mr. Caldwell, and requested an interview with that gentleman. The clerk having Mr. Caldwell in charge insisted on the plaintiff’s sending in his card, but as the plaintiff had no cards he was obliged to wait until the “admitted by card gentlemen” had finished their business, when he was politely informed by the clerk that Mr. Caldwell would like to have him put his complaint in writing and he would then consider it. The plaintiff replied that he would be glad to do so, and with that object in view at once procured a summons and complaint to be served on Mr. Caldwell.
None of the facts sworn to by the plaintiff are denied by the defendant, but it is claimed, and that is also undisputed, that the *700 boat which the plaintiff took at the “Soo"- belonged to another line. It is not disputed that the agent Doty telegraphed to the Lake Michigan Transportation Company’s agent to reserve berths for the Buffalo passengers, including the plaintiff, and that the agent sent him a reply in which he agreed to reserve nineteen double rooms for the Buffalo passengers, which was a sufficient number to accomodate all of the defendant’s passengers on the Empire Slate going to Chicago. It is claimed that the Lake Michigan Transportation Company failed to carry out its part of the contract, and'hence it is claimed that the defendant is not liable for such failure by the Lake Michigan Transportation Company to carry out the terms of the contract on its end of the route.
We are referred to no authority by counsel for the defendant sustaining the position taken by him, but it is argued that the Lake Michigan & Lake Superior Transportation Company being a separate corporation, having boats of its own, not under the control of the defendant, which fact was known to the plaintiff, that it was only obliged to furnish him transportation to the “ Soo,’’ and after that all responsibility for transportation to Chicago ceased.
This theory must depend very much on what the contract which the defendant entered into with the plaintiff was. The circulars assure the public that for the sum of nineteen dollars they will furnish transportation with stateroom, berth and meals to Chicago. This was evidently the understanding of the plaintiff, gathered from its circular and the agent. It was competent for the defendant to make an agreement to take passengers to Chicago partly over its own line and partly over the line of another company. Quimby v. Vanderbilt, 17 N. Y. 306; Swift v. Pacific Mail S. S. Co., 106 id. 206; 8 St. Rep. 602. And that it did undertake to do it in this case there is sufficient evidence to warrant the jury in finding. It sold tickets over another line connecting with its own line and assumed to secure berths for its Chicago passengers over that line. If such was its contract and its corresponding line failed to furnish proper accommodation for passengers coming on defendant’s boats, we think the defendant would be liable for such a failure, notwithstanding the defendant has a printed notice on the ticket that it acts as agent and is not responsible beyond its own line in selling tickets over the Lake Michigan Transportation Company’s line.'
“ It is not claimed by the defendant,” quoting from counsel’s brief, “ that the mere acceptance by the appellant of tickets on which a notice is printed to the effect that the respondent in selling the tickets acts as agent and is not'responsible beyond its own line relieved the respondent from liability for any act of the connecting line, * * * but it is claimed from all the testimony in the case that it may be fairly inferred that the appellant when he purchased the tickets had notice of the fact that the respondent’s boats only went as far as the ‘ Soo,’ and there was an implied assent to the limitation of the respondent’s liability, as set forth in the notice printed on the ticket."
*701 We do not think that such was the necessary understanding of the contract. The conduct of the plaintiff from first to last rebuts any such assent, and such is not the only inference to be drawn from the evidence." The plaintiff bought a ticket to Chicago over the defendant’s line and such other lines as it had the right, by previous arrangement, to ticket over, and the printed circular which was a part of the contract expressly guaranteed berths to the end of the journey.
The notice printed on the ticket is not a contract which binds the passenger. The ticket is a mere voucher or token that the party holding it has paid his fare. Nevins v. Bay State Steamboat Co., 4 Bosw. 225; Quimby v. Vanderbilt, 17 N. Y. 306. If it was the understanding of the parties that the plaintiff was being ticketed through to Chicago, then the defendant would be liable to the plaintiff for such damage as he can show he sustained. Swift v. Pacific Mail S. S. Co., 106 N. Y. 206; 8 St. Rep. 602.
We think, therefore, that the case should have been submitted to the jury upon the question whether the contract which was entered into in Buffalo, at the time of the purchase of the tickets by the plaintiff, was one to carry the plaintiff through to Chicago and furnish him with a berth in a stateroom.
As to the other point raised by the plaintiff, that no damages were shown, we think if a contract is shown to have been made to take the appellant through to Chicago and furnish him with a berth, and that there was a failure by the defendant or the corresponding line to carry out its part of the agreement, then the plaintiff was entitled to some damage, and the amount which he should recover was for the jury to determine.
The judgment of the municipal court must, therefore, be reversed, with costs.
Hatch and White, JJ., concur.
Judgment reversed, with costs.